[Cite as *Stanley Miller Constr. Co. v. State*, 2010-Ohio-1488.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

STANLEY MILLER CONSTRUCTION CO.

    Plaintiff

    v.

STATE OF OHIO

    Defendant

    and

CANTON CITY SCHOOL DISTRICT BOARD OF EDUCATION, et al.

    Defendants/Third-Party
    Plaintiffs

    v.

OHIO SCHOOL FACILITIES COMMISSION

    Defendant/Third-Party Defendant
    Case No. 2006-05632-PR

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiff, Stanley Miller Construction Company (Stanley Miller), brought this action against defendants, Ohio School Facilities Commission (OSFC) and Canton City School District Board of Education (Canton), alleging breach of contract, negligence, and unjust enrichment. The case was tried to the court on the issues of liability and damages.

{¶ 2} The procedural history of this case begins on June 30, 2006, when Stanley Miller filed a complaint against Canton in the Stark County Court of Common Pleas. Canton filed an answer to Stanley Miller's complaint and a third-party complaint against OSFC on August 16, 2006. The filing of the third-party complaint against OSFC in the common pleas court, combined with the later mandatory filing of a petition for removal in this court on September 1, 2006, effected the removal of the case to this court pursuant to R.C. 2743.03(E).[1]

{¶ 3} Stanley Miller entered into a contract with OSFC and Canton in January 2003 for the construction of what was to be the Lehman Middle School (Lehman project). During the construction phase, ownership of the proposed middle school was to be shared by OSFC (77 percent) and Canton (23 percent). Although Canton was not a signatory to the contract between OSFC and Stanley Miller, there is no dispute that Canton was an intended beneficiary of such contract.[2]

{¶ 4} Stanley Miller was a prime contractor on the project having been awarded a contract for numerous divisions of the work, including the division for masonry, which was the largest single component of the project. Jeffrey Tuckerman, OSFC's project administrator, selected Ruhlin Construction (Ruhlin) as construction manager for the Lehman project. According to Tuckerman, Ruhlin was an extension of OSFC with respect to the management of the Lehman project.

{¶ 5} Stanley Miller alleges that their work on the Lehman project was plagued by a myriad of costly inefficiencies that were caused by factors outside of its control. For example, Stanley Miller alleges that the combined effect of a hopelessly flawed construction schedule and the persistent meddling of Ruhlin resulted in delays and extra work.

{¶ 6} On July 2, 2004, the scheduled project completion date, Stanley Miller submitted a one-page document to OSFC wherein Stanley Miller demanded that OSFC make an equitable adjustment to the contract price of more than $1.1 million in order to compensate Stanley Miller for unanticipated additional costs it had incurred on the project. The document was authored by Stanley Miller Vice President and Co-owner,

---

[1]On June 29, 2006, Stanley Miller filed an original action in this court against OSFC arising from the same transaction. See *Stanley Miller Constr. Co. v. OSFC*, Ct. of Cl. No. 2006-04351. Although the two cases were combined for trial, the court will issue a separate decision for each case.

[2]OSFC and Canton will be referred to collectively as "OSFC" throughout this decision.

Steve Miller, and became known at trial as the "one-page, $1.1 million claim." (Plaintiff's Exhibit 64.) The document reads as follows:

| | Est. | Actual | Difference |
|---|---|---|---|
| Masonry costs including labor, material and equipment | 2,274,738.00 | 2,751,130.77 | (476,392.77) |
| Cold Weather Protect | 0.00 | 35,973.27 | (35,973.27) |
| Backfill Retaining Walls | 17,400.00 | 51,707.84 | (34,307.84) |
| Concrete Costs | 404,200.00 | 507,029.96 | (102,829.96) |
| Clean Up Costs | 23,000.00 | 56,583.29 | (33,583.29) |
| Temp. Roads, Repair Sub-grade | 8,500.00 | 25,973.04 | (17,473.04) |
| Sewer Work | 53,700.00 | 71,364.53 | (17,664.53) |
| Roof Trusses | 221,600.00 | 291,974.39 | (70,374.39) |
| | | Total Losses | (788,598.79) |
| | | Total OH & Profit | (350,000.00) |
| | | | (1,138,598.79) |
| | | Current Contract | 5,923,846.19 |
| | Costs as of this date (7/1/04) | | (6,660,747.80) |
| | | | (736,901.61) |
| | Estimated costs to complete, (Concrete bills yet to arrive and labor to install curb and sidewalk along Broad St.) | | (51,697.18) |
| | | | (788,598.79) |

{¶ 7} Although there were some subsequent communications between the parties regarding the claim and a brief meeting which occurred in July 2004, it is clear that no payment was made. Plaintiff now seeks to recover these additional costs under theories of breach of contract, negligence, and unjust enrichment. The third-party complaint states a claim for contractual indemnity.

## I.  THE LEHMAN PROJECT

{¶ 8}  As stated above, following a competitive bidding process, Stanley Miller was awarded a contract for multiple divisions of the work on the Lehman project, including the following :

{¶ 9}  "1.  **Bid Package 2B - Site Work** is generally all labor, equipment, material and supervision as required to complete:  site development, removal of existing concrete and asphalt, earthwork, asphalt paving, concrete walks and curbs, sewer collection systems, bicycle parking racks, landscape work, and site concrete.

{¶ 10} "2.  **Bid Package 3B - Interior Concrete Slabs** is generally all labor, equipment, material and supervision as required to complete:  slab on grade and slab of deck.

{¶ 11} "3.  **Bid Package 4A - Masonry** is generally all labor, equipment, material and supervision as required to complete:  exterior and interior masonry, including site work masonry, insulation, caulking and related work as shown on the Contract Documents.

{¶ 12} "4.  **Bid Package 5B - Miscellaneous Metals** is generally all work required to provide materials and complete installation of materials such as ladders, stairs, handrails, etc which includes offloading, shakeout, raising, bolting, cutting, welding, alignment, shop priming, galvanizing and touch-up.  The Prime Contractor responsible for this work shall be termed the Miscellaneous Steel Installation Contractor (MSIC).

{¶ 13} "5.  **Bid Package 9A - General Trades Package** is generally all labor, equipment, material and supervision as required to complete:  Rough and finish carpentry, insulation, EIFS, shingled and metal roof, all interior and exterior doors, frames, and hardware, rolling security gates, glass and glazing, studs and drywall, all flooring, finish carpentry, caulking, gypsum board walls, acoustical ceilings, paint, division 10 specialties, stage equipment, projection screens, athletic equipment, and gym bleachers." (Plaintiff's Exhibit 2.)

{¶ 14} As is evident from the quantity of work that Stanley Miller was responsible to complete on the Lehman project, the construction of the Lehman Middle School was essentially a Stanley Miller project.  The Lehman project was scheduled to be completed on or before July 2, 2004, but work continued until early 2005.  There is no

argument that the project was substantially completed by the start of the school year and that the building was open for classes in August 2004.

## II. STATUTE OF LIMITATIONS

{¶ 15} OSFC contends that Stanley Miller's cause of action for breach of contract accrued at the time the breach occurred. OSFC argues that the latest date when a breach could have occurred was when Stanley Miller incurred the additional costs it seeks to recover. Steve Miller testified that a majority of additional costs reflected in the one-page, $1.1 million claim were incurred by Stanley Miller in 2003. As noted above, Stanley Miller filed this action in the court of common pleas on June 30, 2006, more than two years after such costs were incurred.

{¶ 16} For the following reasons, OSFC's argument is without merit. First, as a general rule, a party's failure to raise an affirmative defense either by motion before pleading pursuant to Civ.R. 12, a responsive pleading pursuant to Civ.R. 8(C), or a timely amendment under Civ.R. 15, waives the party's right to subsequently raise the defense. *Marok v. The Ohio State Univ.* (June 26, 2008), Franklin App. No. 07AP-921, 2008-Ohio-3170, citing *Mills v. Whitehouse Trucking Co.* (1974), 40 Ohio St.2d 55. Here, OSFC did not assert the defense until the second day of trial, when it orally moved to amend its pleading.

{¶ 17} OSFC attempts to excuse its failure to earlier assert the affirmative defense of the statute of limitations by claiming that it discovered only after the trial had commenced that a portion of Stanley Miller's one-page, $1.1 million claim included costs that were allegedly incurred in 2003. However, given the sheer size of the claim, and the fact that some of the elements of the claim necessarily relate to work that was completed early in the Lehman project, OSFC should have been aware of the potential defense well ahead of the trial. Thus, OSFC's failure to earlier assert the defense is not excusable.

{¶ 18} Moreover, the evidence in this case shows that the one-page, $1.1 million claim was never formally rejected by OSFC. The parties briefly met to discuss the claim and it is clear that OSFC asked Stanley Miller for more information about the claim, but no further action was taken. Thus, with respect to the portions of the one page, $1.1 million claim that have not been waived by Stanley Miller, Stanley Miller's cause of

action for breach of contract was timely filed. See *The Painting Co. v. The Ohio State Univ.*, Franklin App. No. 09AP 78, 2009-Ohio-5710.

## III. MASONRY WORK

{¶ 19} For this division of the work, Stanley Miller was to provide "all labor, equipment, material and supervision as required to complete exterior and interior masonry, including site work masonry, insulation, caulking and related work as shown on the Contract Documents." Inasmuch as the majority of Stanley Miller's claim is for additional masonry costs, the court will begin its discussion with that element of the claim. As noted above, Stanley Miller claims that OSFC breached the contract by failing to provide it with a workable construction schedule and by wrongfully interfering with Stanley Miller's work.

### A. The Schedule

{¶ 20} Article 4.3.2 of the contract provides in relevant part:

{¶ 21} "The Contractor shall cooperate with the Construction Manager to prepare a Construction Schedule which shall include, without limitation, the following information.

{¶ 22} "* * *

{¶ 23} "4.3.2.5  The critical path of the Work

{¶ 24} "4.3.6  Unless otherwise specified in the Contract Documents, the Construction Manager shall update the Construction Schedule on a monthly basis and upon any approval of all Contractors in accordance with subparagraph GC 4.3.5.4." (Plaintiff's Exhibit 2.)

{¶ 25} The court heard a great deal of testimony regarding the quality of the schedule. Joel Reot, Ruhlin's construction superintendent, prepared the original or baseline schedule. By Reot's own admission, his prior experience with construction scheduling does not qualify him as an expert in the critical path method (CPM). Although Ruhlin does have employees on its payroll who possess such scheduling expertise, Ruhlin chose not to consult such employees in developing the schedule for the Lehman project. Reot also admitted that the Lehman project was twice the size of any project he had previously scheduled.

{¶ 26} Steve Miller testified that he had serious reservations about the baseline schedule. In Miller's view, the Lehman project was a masonry-driven project which meant that the masonry walls were its primary component. In his opinion, the Lehman project schedule should have been formulated to best accommodate that division of the work. Given the weather in Ohio, Miller also believed that the exterior masonry walls should have been made a scheduling priority.

{¶ 27} Stanley Miller President, David Miller, also questioned the logic of the baseline schedule stating that "masonry must lead the work on this type of project." Greg Davis, Stanley Miller's project superintendent, agreed stating that the schedule should have been formulated with the masonry work as the "lead aspect." He also believed that an efficient schedule for the Lehman project would prioritize the completion of exterior masonry walls in area B inasmuch as such walls were "below grade," and thus, difficult to access later in the project. He described area B as the "lynchpin" of the masonry division. Davis believed that the schedule was mistakenly formulated to accommodate the division of the work pertaining to structural steel, a relatively small portion of the work. Although Davis did not believe the faulty schedule prevented Stanley Miller from performing the masonry work, he was certain that it made performance more labor intensive, more time consuming, and costlier. According to Davis, the baseline schedule "was not a workable schedule."

{¶ 28} Donnie Kramer took over for Davis as project superintendent when the Lehman project was 15 percent to 20 percent complete. When he reviewed the baseline schedule, he determined that more than 100 activities lacked either predecessor or successor activities and that certain activities which were identified as "critical" were clearly not priorities. For example, the schedule identified the completion of certain interior walls as a critical activity at a point in time when the exterior walls had not yet been completed.

{¶ 29} Another criticism of the schedule voiced by Kramer was the fact that it required certain interior walls to be completed during the summer months while the construction of exterior walls in other areas was left for the winter months when such construction was more costly. Kramer stated that interior walls are better left to the winter months after the entire structure is enclosed. He testified that a good CPM

schedule "is a blessing; it makes life much easier for me."  Kramer opined that Ruhlin's baseline schedule  could not even be considered a true CPM schedule.

{¶ 30} The most enlightening testimony regarding the schedule was that of Stanley Miller's expert, Trisha Gardina.  Gardina's credentials include a Bachelor of Arts degree in constructing engineering, post-graduate work towards a Master's in Civil Engineering, and significant experience as a scheduler while employed by Ruhlin.  As a principal in TG Consulting, Inc., Gardina now instructs others in the construction industry in CPM and she is leading an effort to have the field of construction scheduling recognized as a profession in Ohio.  Gardina testified that in the course of her experience and training, she had become expert in the use of construction scheduling software known as Prima Vera, which she referred to as "the Cadillac of CPM scheduling software."

{¶ 31} Gardina was first contacted about the Lehman project in August 2003, when Keith Hoffman, Stanley Miller's project manager, asked her to review the Lehman project schedule.  According to Gardina, after spending only a short time reviewing the baseline schedule, she was able to determine that it was "grossly inadequate."  She made some suggestions to Hoffman regarding improvements that could be made, but she was not retained as a consultant at that time.

{¶ 32} Thereafter, Hoffman  met with Reot for the purposes of revising the schedule.  The result of the meeting was a revised schedule that Hoffman believed would resolve some of the issues with the original schedule.  However, Hoffman was still of the opinion that the revised schedule was inadequate to meet Stanley Miller's needs.  Although four subsequent updates to the schedule were drafted, Hoffman was never satisfied that the schedule was workable.  At trial, Reot acknowledged that Hoffman had a good understanding of CPM scheduling.

{¶ 33} After this action was filed, Stanley Miller once again contacted Gardina. Gardina thoroughly dissected the Lehman baseline schedule and the four schedule updates that were generated by Ruhlin and, in the course of her testimony, she educated the court regarding general principles of CPM scheduling as well as the intended benefits of such a schedule.  According to Gardina, the goal of the CPM schedule is to identify the activities that are critical to the completion of the work and to develop both a logical sequence and a reasonable time-frame within which such activities must be completed.  With the help of the scheduling software, predecessor

and successor activities are assigned to each critical activity and individual float values are calculated. The "float" represents the number of days between the earliest possible date on which an activity may commence and the last acceptable date on which the activity must be completed. Gardina testified that when the float values are inaccurate the schedule is unreliable. She opined that the baseline schedule developed by Ruhlin contained a negative overall float value which meant that the individual float values were wrong. The schedule was also missing numerous predecessor and successor activities which, according to Gardina, undermined the logic of the schedule.

**{¶ 34}** In Gardina's opinion, the strict implementation of a schedule such as the one generated by Ruhlin for the Lehman project would seriously impact the efficiency of the contractor's work. Specifically, Gardina stated that the contractor working under such circumstances would be expected to work on activities with float when it should be working on predecessors to critical activities. An inevitable result of a faulty schedule such as the one developed by Ruhlin is that the contractor will appear to be behind schedule in completing a particular activity even before the true float for that activity has been exhausted. Gardina testified that another inevitability of such a poor schedule is that the contractor will be forced to put more effort into each activity, whether it be extra time, labor, or equipment, "just to keep up." Gardina's review of the correspondence and e-mails between Ruhlin and Stanley Miller convinced her that Stanley Miller experienced all of these difficulties during the Lehman project. The court's review of the relevant materials leads the court to the same conclusion.

**{¶ 35}** Although OSFC pointed out that construction scheduling has not yet been nationally recognized as an accredited profession, the court finds that Gardina was qualified to testify as an expert in the field of construction scheduling by virtue of her knowledge, skill, experience, and training in that field. The court also found her testimony to be both credible and persuasive. Although OSFC also presented the testimony of a scheduling expert with fine credentials, the court was not persuaded by his testimony.

**{¶ 36}** OSFC contends, in the alternative, that even if the schedule was faulty, Stanley Miller must share the blame for the alleged deficiencies in the schedule inasmuch as Stanley Miller failed timely to provide feedback to Ruhlin regarding the

baseline schedule and thereafter failed timely to notify Ruhlin of any perceived problems with the schedule. The evidence does not support OSFC's argument.

{¶ 37} Although it is true that Stanley Miller did not provide certain preliminary scheduling information to Ruhlin within the time required by the contract, the testimony established that none of the contractors did so on this project and that such a circumstance is not uncommon. Additionally, as previously stated, Stanley Miller did inform Ruhlin of problems with the schedule well before the masonry work was to commence. The court is also convinced that a mere extension of time would not have mitigated the problems inherent in the faulty schedule or have otherwise prevented the inefficiencies and extra costs that were a foreseeable result of such a schedule. For similar reasons, the court does not believe that earlier intervention by Stanley Miller would have made any difference. The contract provided that Ruhlin was to draw up the schedule; Ruhlin chose Reot for that task; and Reot chose not to consult with scheduling experts on Ruhlin's payroll.

{¶ 38} Based upon the totality of the evidence, the court finds that the schedule developed by Ruhlin was both logically flawed and hopelessly incomplete. Thus, it is the conclusion of the court that OSFC breached the contract, by and through Ruhlin, by failing to provide Stanley Miller with a workable CPM schedule as required by Articles 4.3.2 – 4.3.6.

{¶ 39} Having determined that OSFC breached the contract by not providing Stanley Miller with a workable CPM schedule, the question becomes whether the schedule resulted in compensable extra costs to Stanley Miller.

{¶ 40} Article 2.1.1 provides "[t]he Contractor shall be responsible for and have control over all construction means, methods, techniques, sequences and procedures for all portions of the Contractor's Work * * *."

{¶ 41} Stanley Miller claims that Ruhlin's slavish devotion to a flawed and unworkable schedule caused Stanley Miller to perform the work in an inefficient manner, thus raising its costs. Stanley Miller further contends that Ruhlin's project superintendent, Brad Way, stubbornly refused to allow it to deviate from the schedule, which had the effect of usurping Stanley Miller's right to exercise control over the means, methods, techniques, sequences, and procedures (means and methods) regarding the masonry division.

{¶ 42} Article 4.1.6 of the contract provides: "The Contractor shall supervise the Work in conformity with the coordination of the Construction Manager and shall take orders and directions from the Construction Manager as provided in the Contract Documents. Orders and direction from the Construction Manager for the coordination of the Work of the Contractors shall not relieve the Contractor from the Contractor's duty to supervise the Contractor's Work in accordance with the Contract Documents."

{¶ 43} According to Stanley Miller, whenever its efforts to exercise control over the means and methods of the masonry work conflicted either with Ruhlin's schedule or the work of other contractors, Brad Way ordered Stanley Miller's employees to move to another area. According to Stanley Miller, when it resisted Brad Way's directives, it was threatened either with the unjustified assessment of liquidated damages or the wrongful withholding of progress payments.

{¶ 44} Stanley Miller's management team on the Lehman project consisted of Carl Weithman (masonry foreman), Ron Nichols (site foreman), Norman George (concrete foreman), Hoffman, and Davis. Donnie Kramer replaced Davis as project superintendent when he became available in July 2003 whereupon Davis returned to his usual duties as a general project manager.

{¶ 45} Kramer described Stanley Miller's intended approach to the masonry work on the Lehman project:

{¶ 46} "A. Every building is different, but myself, when I have high sections, if they are combined like this particular project was in the center of the building, I always try to build in the high part first and work away from it, because you need the access to reach that. And the most efficient way of reaching it is with a forklift, a new Pettibone or Lull. You do not want to use a crane in servicing masonry. And if you get blocked out, that's what you end up doing.

{¶ 47} "And I will also – there again, every building's different. If it's possible, I will start the crews at one end, say, it be north, and try to work it to the south so that all the other crews can follow and stay out of the way of the progress going in that direction, finishes – the rough, the roof, everything can just – everybody follows and moves, and they are staying out of each other's work areas, and they are able to perform efficiently, because you are not working around other trades or other materials." (Transcript, Page 39, Line 5 - Page 40, Line 2.)

{¶ 48} A number of Stanley Miller's employees were asked about the progress of the masonry work on the Lehman project and each told a similar story. For example, Stanley Miller's masonry foreman, Carl Weithman, testified that he and his crew were constantly being pushed by Way. He testified that each day he developed and then began to implement a plan for his crew but that, "three hours in," Way would move his crew out of that location. Weithman also related that he wanted to first work on section B (penthouse) because access to that area would be more difficult later in the project, but that Way would not let his crew work in that area. Weithman's plan to install masonry block and brick in succession at any given location was also thwarted by Way.

{¶ 49} According to Weithman, Way's fiery disposition caused him to consider leaving the job on several occasions. Weithman once observed Way screaming at a contractor at the top of his lungs while throwing and then kicking his own hard hat. Weithman testified that because of Way's behavior, he decided to leave the job shortly before its completion.

{¶ 50} One of Weithman's crew, a 45-year union bricklayer by the name of Charlie Mize, testified that being moved from one area of the project to another before completing the work was "very unusual" but that it happened frequently on the Lehman project. He believed Way intentionally made things as difficult on Stanley Miller as he could. For example, Mize stated that Way waited until the roof of one of the building's units was completed before informing Stanley Miller that it needed to re-grout the masonry walls; a task that is much more difficult when the wall is under roof.

{¶ 51} Davis testified that Stanley Miller's preferred method was to lay concrete block in one area and then lay brick in that same area so that his masons could efficiently complete an entire masonry wall. According to Davis, Way would often demand that his masons cease work in the middle of the day and order them to remove all of their materials and equipment from a location in order to accommodate other contractors. On many such occasions, Way refused Davis' request to leave scaffolding in place and ordered that it be torn down. Thus, when Stanley Miller returned to complete the work it was required to reassemble scaffolding and/or tents and redeliver sand and mortar to the site.

{¶ 52} According to Kramer, due to the Ruhlin schedule and the demands of Way, Stanley Miller was not permitted to finish masonry walls in the penthouse of area B as planned; that when Stanley Miller returned to area B to finish the work, other

trades were found to have blocked access to the site resulting in no choice but to employ a crane to move materials into place. Stanley Miller also experienced delays in performing such work inasmuch as other contractors were often performing work below. Kramer explained that it is unsafe for Stanley Miller to use a crane to move materials when other contractors are working below. Kramer believed that Way "used the schedule as a weapon" against Stanley Miller.

{¶ 53} Even Reot admitted that Way was more difficult to work with on the Lehman project than he had been on past projects. Reot testified that he and Way "worked differently" and that "he [Reot] was not out to get anyone."

{¶ 54} Way's recollection of the Lehman project was quite a bit different than that of Stanley Miller's employees. Way testified that he had a good working relationship with Kramer and Stanley Miller's other foreman. He even commended Weithman and his masons on the quality of their work, referring to Weithman as "very competent." Way denied ordering Stanley Miller's masons to cease work and move to other areas of the site. He stated that it was Stanley Miller's employees who often sought him out for guidance when their own foreman was not on site. Way admitted that he frequently questioned why Stanley Miller's masons were working certain areas and he acknowledged that Stanley Miller's employees seemed to be "jumping around a lot." Although Way agreed that Stanley Miller had a contractual right to control the means and methods of the work, he believed that Ruhlin had the right to dictate the sequence of such work.

{¶ 55} Way attributed the extra masonry costs allegedly incurred by Stanley Miller to Weithman's decision to tear down and then rebuild two masonry walls that were not built to Weithman's standards. Way also criticized Stanley Miller for not keeping a foreman at the site at all times and he believed this may have contributed to the extra costs. When questioned by counsel about his involvement in the current dispute and Stanley Miller's criticism of his management style Way simply responded, "I was just doing my job."

{¶ 56} In *Sherman R. Smoot, Co. v. Ohio Dept. of Adm. Serv.* (2000), 136 Ohio App.3d 166, a masonry contractor established a right to recovery from the owner by showing that the failure of another contractor to timely complete its work caused the masonry contractor to proceed at less than peak efficiency. The masonry contractor

introduced evidence showing that "masonry crews were often unable to complete one task before moving on to the next task." Id. at 181. According to the testimony of the contractor's vice president and project manager, the contractor "was forced to have its masonry crews move back and forth between uncompleted jobs in order to keep them working" and that "moving masons back and forth between jobs dramatically increased the amount of preparatory masonry work, such as dismantling and erecting scaffolding, which the mason-helpers had to perform." Id. at 182. The contractor's expert stated that "having the masonry's crews move back and forth between partially completed masonry jobs caused the crews to operate at less than peak productivity." Id. The Tenth District Court of Appeals held that the masonry contractor was entitled to damages representing the additional labor costs for both the masons and mason-helpers, plus the extra costs attributable to the increased ration of masons to mason-helpers. Id. at 181-182.

{¶ 57} Based upon the totality of the evidence and weighing the credibility of the witnesses, the court finds that Stanley Miller's employees provided the court with the a more reliable recollection of events. Indeed, the court finds that Way's mistaken belief that Ruhlin had the right to control the sequence of the masonry work and his zealous exercise of that control during the project exacerbated the difficulties inherent in the logically flawed and incomplete schedule. The court also has no doubt that Stanley Miller's desire to perform the masonry work on the Lehman project by the means and methods it believed to be the most efficient, often conflicted with Way's desire to proceed in accordance with the schedule. As a result of this conflict, the court finds that an unhealthy antagonism developed between Way and Stanley Miller which stifled effective communication and made dispute resolution extremely difficult.

{¶ 58} In short, the court finds that OSFC, by and through Ruhlin, breached Articles 2.1.1 and 4.3.2 - 4.3.6 of the contract. The court also finds that the breach of contract caused Stanley Miller to incur extra costs.

### B. Waiver

{¶ 59} Having determined that OSFC breached the agreement and that Stanley Miller incurred extra costs as a result of the breach, the question becomes whether Stanley Miller waived its right to an equitable adjustment to the contract by failing to strictly comply with the requirements of Article 8.

{¶ 60} Article 8 details the procedure for requesting additional payment. The relevant provision of the parties' agreement reads as follows:

{¶ 61} "8.1.1 Any request for equitable adjustments of Contract shall be made in writing to the Architect, through the Construction Manager, and filed prior to Contract Completion, provided the Contractor notified the Architect, through the Construction Manager, no more than ten (10) days after the initial occurrence of the facts which are the basis of the claim. *To the fullest extent permitted by law, failure of the Contractor to timely provide such notice and a contemporaneous statement of damages shall constitute a waiver by the Contractor of any claim for additional compensation or for mitigation of Liquidated Damages.*

{¶ 62} "8.1.2 In every such written claim filed in accordance with paragraph GC 8.1.1, the Contractor shall provide the following information to permit evaluation of the request for equitable adjustment of the Contract.

{¶ 63} "8.1.2.1 Nature and amount of the claim;

{¶ 64} "8.1.2.2 Identification of persons, entities and events responsible for the claim;

{¶ 65} "8.1.2.3 Activities on the Construction Schedule affected by the claim or new activities created by any delay, interference, hindrance or disruption and the relationship with existing activities;

{¶ 66} "8.1.2.4 Anticipated duration of any delay, interference, hindrance or disruption;

{¶ 67} "8.1.2.5 Recommended action to avoid or minimize any future delay, interference hindrance or disruption.

{¶ 68} "8.2.1 To avoid or minimize the filing of requests for equitable adjustment of the Contract, the Contractor and the Construction Manager, with the assistance of the Architect, shall endeavor to timely and proactively identify, address and resolve matters involving persons, entities or events which may give rise to a request for equitable adjustments of the Contract.

{¶ 69} "8.2.2 The Construction Manager, with the assistance of the Architect, shall within 30 days of receipt of a request for equitable adjustments of the Contract filed pursuant to paragraph GC 8.1.1, schedule a meeting with the Contractor to

implement the job site dispute resolution procedures the parties agreed to implement as a result of the partnering arrangement." (Emphasis added.)

{¶ 70} Stanley Miller concedes that it did not strictly comply with Article 8, but it argues that OSFC either waived strict compliance with the claims process or that other circumstances excused noncompliance.

{¶ 71} In *Craft General Contractors, Inc. v. City of Urbana* (Feb. 2, 1982), Franklin App. No. 81AP-346, a project engineer required a contractor to purchase a more expensive type of backfill than was specified in the project plans. Although the dispute about the backfill arose in April 1979, the contractor did not file a written claim until July 1979. The owner rejected the contractor's claim because it was filed beyond the one-week time period set forth in the contract. The trial court found that the contractor had waived the claim and granted summary judgment in favor of the owner. The court of appeals held that the contractor's "delay in filing [a] written claim beyond the one-week time period stipulated in * * * the contract did not defeat its claim since [the owners] had independent knowledge of the condition complained of and had oral notice of [the contractor's] complaint and [the owners] were not prejudiced by lack of earlier written notice." Id. at 23.

{¶ 72} The court acknowledges that the facts alleged in this case are different from those in *Craft General*, supra. For example, the nature of the masonry claim made by Stanley Miller involves inefficiencies rather than material costs. Nonetheless, the court finds that the logic of *Craft General* is applicable herein.

{¶ 73} The evidence shows that Stanley Miller made an effort at the earliest stages of the project to inform Ruhlin of its problems with the baseline schedule and that it later became involved in reworking the schedule, to little or no avail. Steve Miller informed Ruhlin in February 2003, that there was insufficient time built into the schedule for Stanley Miller to complete critical activities. Miller requested an extension of 174 days but when it was given only 44, it sent a prompt reply, wherein Miller explained his position as follows: "I cannot sign your schedule in its present form. With regard to the masonry, I asked for an additional 174 days. In return you gave me 44, of those 44 days most have little affect (sic) on the critical path. On three (3) items which do affect the critical path, you decreased my time by 40 days. On other critical path items you gave me a total of 24 days. The bottom line is that I need more days especially on bearing CMU walls & brick veneer."

{¶ 74} Stanley Miller continued to voice specific concerns about the schedule in July 2003 when Hoffman wrote to Reot that the schedule was "illogical at best." In his letter, Hoffman complained that the schedule erroneously required interior masonry walls to be completed before the structure was fully enclosed. Hoffman also stated that the schedule "is only seventy-five 75% complete and cannot be used effectively." (Plaintiff's Exhibit 20.) Hoffman advised Reot that proceeding with the work pursuant to the schedule was not efficient. Finally, Hoffman offered to meet with Reot to revise the schedule and asked Reot for an electronic copy of the schedule to facilitate that end.

{¶ 75} With regard to the interference of Brad Way, although Reot testified that he did not specifically recall any Stanley Miller complaints about Way, and that he "vaguely remembers" Stanley Miller's request that Way be removed from the project, the evidence proves that Stanley Miller frequently expressed serious concerns about Way. For example, in a September 4, 2003 letter to Reot, Hoffman requested that "any communication between Ruhlin and Stanley Miller be directed either through this office or our job-site superintendent, Donnie Kramer. Please do not give direction to any other field personnel." (Plaintiff's Exhibit 23.) The evidence establishes that this letter was in reference to Way's interference. The very next day, Hoffman wrote Reot complaining that "there is no money in our bid to pay field personnel to discuss the job with [Way]. This disruption in work-flow adds up over the length of the job and is not recoverable." (Plaintiff's Exhibit 24.) David Krutz, Ruhlin's project executive, testified that he had oversight responsibility for all Ruhlin/OSFC projects, of which there were many. Although he visited the Lehman project job site on only a half-dozen occasions, he testified that in early 2004 he was aware that Stanley Miller was having trouble with Way.

{¶ 76} When Stanley Miller's complaints were not addressed, Hoffman requested that Way be removed from the project. In his March 11, 2004 letter to Reot, Hoffman recommended Way's removal to "avoid or minimize any future interference, disruption, hinderance or delay." (Plaintiff's Exhibit 43.) The trial testimony given by both Ruhlin and OSFC personnel involved in the project convinces the court that the recommendation was not seriously considered by OSFC. Thus, the court finds that OSFC was well aware of the negative impact upon Stanley Miller caused by the

combined effect of the faulty schedule and the interference of Way with Stanley Miller's means and methods.

{¶ 77} With regard to the issue of prejudice, OSFC argues that plaintiff's late presentation of the one-page, $1.1 million claim for extra compensation, combined with the lack of a detailed accounting of the items comprising the claim, prevented OSFC from conducting a meaningful investigation into the claim and thwarted OSFC's defense of the claim. With respect to the masonry division, OSFC's argument rings hollow. The effect of the faulty schedule upon Stanley Miller's prosecution of the masonry work became known to Ruhlin early in this project, but OSFC made no meaningful effort to mitigate the damage. The effect of Ruhlin's interference with Stanley Miller's means and methods was also communicated to OSFC at an early stage of the project, but nothing was done. Under the circumstances, OSFC was not unfairly prejudiced by the lack of earlier notice of the claim, at least as it relates to the masonry division, inasmuch as OSFC has not demonstrated that it would have further investigated the nature and extent of such claim.

{¶ 78} With regard to the lack of detail, OSFC established that it was possible for Stanley Miller to use its own method of job costing "by phase" to track the extra costs attributable to the inefficiencies caused by the poor schedule or the interference caused by Brad Way. The court is not convinced however, that such a procedure would have yielded a more reliable estimate of Stanley Miller's extra costs given the nature of the inefficiencies and the difficulty inherent in measuring the actual cost per occurrence. Moreover, the evidence establishes that Ruhlin never fully appreciated or understood Stanley Miller's difficulties with the schedule and further exacerbated those difficulties by interfering with Stanley Miller's preferred means and methods. Consequently, the absence of detail regarding the specific occurrences comprising Stanley Miller's masonry claim did not unfairly prejudice OSFC in its defense of the claim.

{¶ 79} Based upon the totality of the evidence, the court finds that OSFC was aware of the circumstances that led to the masonry claim, that Stanley Miller gave OSFC both oral and written notice that a claim was contemplated, and that OSFC was not unfairly prejudiced by the failure of Stanley Miller to strictly comply with the contractual dispute resolution process. In fact, given the nature of the masonry claim and the antagonistic relationship between Ruhlin and Stanley Miller, the court further finds that any effort by Stanley Miller to employ the contractual claims process with

regard to the extra masonry costs would have been futile. As a general rule, courts will not require a party to perform a vain act in order to preserve contractual remedies. See, e.g. *Galayda v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421, 1994-Ohio-64; *Conti Corp. v. Ohio Dept. of Administrative Services* (1993), 90 Ohio App.3d 462, 470-471; *George Wiedemann Brewing Co. v. Maxwell* (1908), 78 Ohio St. 54, 66.

{¶ 80} OSFC next contends that the opinion of the Supreme Court of Ohio in *Dugan & Meyers Const. Co., Inc. v. Ohio Dept. of Admin. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, strengthens the waiver rule as it pertains to state contracts and thus, requires judgment in its favor. In *Dugan & Meyers,* the primary issue for the court was whether a clause in the contract precluding the contractor from recovering damages for delay was valid and enforceable. A secondary issue in the case was whether the contractor's failure to request an extension of time within ten days of the occurrence necessitating an extension of time constituted a waiver of the contractor's right to recover damages for the delays. The court held that "[t]he record lacks evidence of either an affirmative or implied waiver by [the owner] of the change-order procedures contained in the contract." Id. at ¶41.

{¶ 81} Contrary to OSFC's assertion, *Dugan & Meyers* does not hold that there are no circumstances under which there may be a waiver of strict compliance with Article 8. Rather, the court in *Dugan & Meyers* simply found that the contractor in that case had failed to demonstrate that it was excused from strict compliance with the contractual claims process. Id. The court does not read *Dugan and Meyers* as an implied rejection of the rule of law set forth in either *Craft General Contractors*, supra, or *Conti*, supra.

{¶ 82} In the final analysis, the court finds that Stanley Miller has proven both that it is entitled to an equitable adjustment to the contract to compensate it for extra masonry costs and that it did not waive its claim by failing to strictly comply with Article 8. The court is aware that the parties followed the contractual claims procedure on numerous occasions during the Lehman project and that the process resulted in change orders and adjustments to the contract price totaling approximately $100,000. The court is also aware that time was of the essence on this project and that, on many occasions, the parties agreed that Stanley Miller would perform certain work and that either a

change order or agreed adjustment to the contract price would be negotiated at a later date. The parties and the contract referred to the later practice as "partnering."

{¶ 83} Given the circumstances surrounding the breach of contract, the court finds that a failure of strict compliance with the contractual claims process by Stanley Miller did not bar a subsequent claim for extra costs incurred in the masonry division. As Hoffman explained at trial, when Stanley Miller first began experiencing inefficiencies in its masonry operation as a result of the faulty schedule and Way's interference, Stanley Miller "had no idea that this would snowball into the mess that it did."

### C. Damages

{¶ 84} As a general rule, in a breach of contract action, the measure of damages is the amount it takes to place the plaintiff in the position it would have occupied had the breach not occurred. *Charles R. Combs Trucking, Inc. v. International Harvester Co.* (1984), 12 Ohio St.3d 241; *Fouty v. Dept. of Youth Services*, 167 Ohio App.3d 508, 2006-Ohio-2957; *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137. Where a party seeks expectation damages, such damages are limited to actual loss, which means that the loss must be established with reasonable certainty. Id.

{¶ 85} OSFC argues Stanley Miller's efforts to recover its extra costs after completion of the work perverts the parties' contractual intent by treating a lump sum contract as if it were a total cost contract. However, a number of Ohio courts, including the Tenth District Court of Appeals, have recognized a total cost theory of recovery, under certain limited circumstances, as a viable method for determining a contractor's damages. See *Cleveland Constr., Inc. v. Ohio Pub. Emps. Retirement Sys.,* Franklin App. No. 07AP-574, 2008-Ohio-1630; *Tony Zumbo & Son Constr. Co. v. Ohio Dept. of Transp.* (1984), 22 Ohio App.3d 141; *High Voltage Systems v. Ohio Dept. of Transp.* (Dec. 19, 1978), Franklin App. No. 78AP-88. Generally, in order for the contractor to recover under a total cost theory, the contractor must establish the following: 1) that it was impossible or highly impracticable for the contractor to prove their actual losses directly; 2) that their bid was reasonable; 3) that the actual costs they sought from the owner were reasonable; and 4) that breach was the sole cause of the contractor's damages. *Cleveland Constr.*, supra, at ¶39.

{¶ 86} With respect to the first prong of the total cost analysis in this case, the court is convinced that it was impractical if not impossible for Stanley Miller to prove the actual extra masonry costs attributable to the combination of the faulty schedule and the interference by Ruhlin. As stated above, given the nature of the inefficiencies, Stanley Miller's customary job-cost phasing practices would have been difficult to apply and, in the opinion of the court, would not have resulted in a more accurate estimate of actual costs.

{¶ 87} As to the second prong of the analysis, OSFC argues that Stanley Miller cannot recover upon a total cost theory inasmuch as its bid significantly underestimates the costs of the masonry work on the Lehman project. According to OSFC, it was Stanley Miller's faulty bid that was the cause of its losses on the project. Once again, the evidence does not support OSFC's contention.

{¶ 88} The court heard extensive testimony regarding Stanley Miller's process for arriving at its bids for the various divisions of the work on the Lehman project. Carl Weithman testified that he personally reviewed the project plans and specifications and that he employed his own computerized digitizing table and computer software known as "EMc2" to arrive at an estimate both of the quantity and the type of masonry units needed to complete the Lehman project. Weithman had joined Stanley Miller as a masonry foreman in 1998. According to Weithman, he brought with him more than 34 years of experience as a brick mason and 20 years of full-time estimating experience. He testified that he had estimated 50 to 70 bids per year as a principal in Weithman Brothers Construction and that he had recently begun estimating for Stanley Miller. According to Weithman, once he determined the number and type of masonry units needed for the job, he contacted Stanley Miller's suppliers to obtain material costs. Weithman obtained labor costs from Dave Miller and then calculated total masonry costs in preparing the bid. Stanley Miller is a union shop and its labor rates are fixed by agreement.

{¶ 89} OSFC claims that Weithman omitted the cost of labor for the brick facing in formulating the bid for the masonry division and that Weithman was mistaken as to the total number of masonry units both for brick and block. However, when one considers the entirety of Stanley Miller's records, as well as the testimony regarding those records, OSFC's criticisms of the Stanley Miller bid are not sustained by the

evidence.  Moreover, the case law requires a reasonable bid, not a perfect one.  See *Cleveland Constr.*, supra.

{¶ 90}   In short, the court is convinced that Weithman's methodology for estimating the quantity and type of masonry units needed to complete the job and the costs to install those units was reliable and that he produced a reasonably accurate estimate.  Indeed, a simple comparison of Stanley Miller's bid price to those submitted by its competitors for the various divisions of the work, supports the conclusion that Stanley Miller submitted a reasonable bid inasmuch as Stanley Miller was not a low bidder on any of the divisions of the Lehman project, including masonry.  In fact, it was only when Stanley Miller submitted its combination bid that it became the low bidder.  Steve Miller testified that the costs for a combination bid are generally lower than the sum of the individual bids because of the fact that the same materials, equipment, labor, and supervision can be employed in multiple divisions of the work, which results in a meaningful cost savings to Stanley Miller and a resulting lower bid price.

{¶ 91}   Based upon the totality of the evidence, the court is persuaded that Stanley Miller's masonry bid was reasonable.  For the court to conclude otherwise would require a finding either that Stanley Miller's overhead costs and anticipated profits were significantly greater than those of its competitors or that Stanley Miller's competitors also underbid the job.  The evidence does not support either finding.

{¶ 92}   With respect to the reasonableness of the actual masonry costs sought by Stanley Miller, OSFC does not seriously maintain that Stanley Miller was incapable of efficiently completing the masonry work.  Both Way and Reot acknowledged that Stanley Miller was a competent masonry contractor.  There is also no dispute that masonry work was, in fact, completed by Stanley Miller and that such work was of good quality.  In short, Stanley Miller has convinced the court that it possessed the capability to timely complete the project at or near its bid price.  Thus, it is permissible to infer that the costs associated with the extra work were reasonable.

{¶ 93}   OSFC, however, points to discrepancies in Stanley Miller's job-cost reports as proof that Stanley Miller's costs were exorbitant.  For example, OSFC identified an obvious error in Stanley Miller's job-costing reports whereby the cost of "legal work" was mistakenly included as part of Stanley Miller's masonry costs.  Although the court agrees that such discrepancies impact the credibility of Stanley Miller's total cost estimate for some divisions of the work, the discrepancies do not

require the conclusion that the actual masonry costs contained in the one-page, $1.1 million claim are so unreliable that recovery under a total cost theory is inappropriate. Again, the case law requires a reasonable estimate of actual costs, not a perfect accounting. *Cleveland Constr.*, supra.

{¶ 94} OSFC argues, in the alternative, that even if Stanley Miller incurred compensable extra masonry costs as a result of OSFC's breach of contract, Stanley Miller is not entitled to rely on the total cost theory inasmuch as such extra masonry costs were not solely caused by OSFC. However, the total cost theory can be modified such that a contractor may yet recover its extra costs so long as an exclusion is made for extra costs not attributable to the owner. See *Cleveland Const.,* supra.; *Phillips Constr. Co. v. United States* (1968), 184 Ct. Cl. 249, 394 F.2d 834; *Servidone Const. Corp. v. United States* (1991), 931 F.2d 860; *Youngdale & Sons Constr. Co. v. United States* (1993), 27 Fed. Cl. 516; *Net Constr., Inc. v. C & C Rehab. & Constr., Inc.* (2003), 256 F.Supp.2d 350.

{¶ 95} Here, although Stanley Miller established that extra masonry costs were attributable to OSFC's breach of contract, OSFC established that some of the costs were not attributable. For example, the evidence establishes that two partially constructed masonry walls were razed and then reconstructed as a result of Stanley Miller's errors. Weithman admitted that Stanley Miller erred in the framing of a doorway and that the fix "took about one full day." Steve Miller acknowledged, upon cross-examination, that he did not reduce Stanley Miller's claim for additional masonry costs to account for any of these costs.

{¶ 96} Additionally, as OSFC correctly points out, poor weather also contributed to the costs of the Lehman project. In an e-mail string dated April 2004, Hoffman referred to the summer of 2003 as "the rainiest summer in over 100 years." In a subsequent meeting with OSFC regarding the one-page, $1.1 million claim, Steve Miller complained to Krutz that costs were elevated by a cold winter and a wet spring. At trial, Hoffman admitted that a portion of the extra time required to complete the masonry work was due to rainy weather but he estimated that portion to be only ten percent. Based upon the totality of the evidence, the court finds both that Hoffman's estimate was low and that Steve Miller made no weather-related deductions from the masonry claim.

{¶ 97}  Finally, Stanley Miller was aware that contracts were awarded on the Lehman project to numerous prime contractors for the several divisions of work.  Thus, Stanley Miller knew that numerous prime contractors would be working simultaneously.  The contract requires that each prime contractor coordinate its work with the work of the others.  Consequently, as OSFC correctly points out, even if Stanley Miller had conceived of a plan for constructing the school that would have achieved peak efficiency for Stanley Miller's masonry operation, the execution of such a plan was not guaranteed by the contract.

{¶ 98}  Stanley Miller is seeking a total of $476,392.77 for extra labor and equipment costs in the masonry division, plus overhead and profit.  Based upon the foregoing, the court finds that Stanley Miller has proven that it incurred extra masonry costs as a result of the flawed schedule and the interference by Ruhlin with its means and methods.  However, the court further finds that Stanley Miller's estimate of such costs must be reduced in order to more accurately reflect the extra costs attributable to the breach by OSFC.  Accordingly, in assessing Stanley Miller's damages the court finds that the $476,392.77 figure requested by Stanley Miller must be reduced by one-half to account for causes other than OSFC's breach of contract.  The reduction results in total compensable extra costs of $238,196.39.

{¶ 99}  With respect to overhead and profit, Stanley Miller's one-page, $1.1 million claim includes profit and overhead of $350,000, which represents the total overhead and profit Stanley Miller expected to recover on the project had the work progressed according to plan.  For a number of reasons, the $350,000 sought by Stanley Miller misstates compensable overhead and profit.

{¶ 100}  First, there is a difference of $130,000 between the overhead and profit which Steve Miller testified that Stanley Miller intended to recover on the project, and the $350,000 figure contained in the one-page, $1.1 million claim.  Second, simply tacking on an additional $350,000 in overhead and profit to Stanley Miller's claim will result in a partial double recovery inasmuch as the original bid necessarily included Stanley Miller's anticipated profit and overhead, whatever that figure may have been.  Third, as noted above, not all of the extra costs in the masonry division are recoverable under the modified total cost theory.

{¶ 101}  The parties' contract speaks to the issue of allowable overhead and profit.  Pursuant to Articles 7.4.1 and 7.4.9, where a change order is warranted,

overhead of "up to ten percent" and profit of "up to five percent" is generally added to the total cost. In this instance, ten percent for overhead and five percent for profit is reasonable in light of Steve Miller's testimony regarding Stanley Miller's bid.

{¶ 102} Accordingly, adjusting compensable costs upward by ten percent ($23,819.64) to account for overhead and another five percent ($11,909.82) for profit results in an equitable adjustment to the contract of $273,925.85. In short, the court finds that this figure represents a reasonable and necessary adjustment to the contract price to account for the compensable extra costs of masonry division.

## IV. CONCRETE COSTS

{¶ 103} The portion of Stanley Miller's claim related to "concrete costs" is more difficult to analyze inasmuch as concrete work was required on more than one division of the work; the concrete division, the general trades division, and the site work.

### A. Concrete Division

{¶ 104} For the concrete division of the work Stanley Miller was required to furnish "all labor, equipment, material and supervision as required to complete: slab on grade and slab of deck." As was the case with masonry, Stanley Miller claims that the faulty schedule combined with the interference by Ruhlin added to the costs of the concrete division. Stanley Miller's concrete foreman, Norman George, testified that he was unaware of any interference by Way with Stanley Miller's prosecution of the work. His only complaint was that he believed his crew was required to do more leveling on the Lehman project than was required on other similar projects. George remembered, however, that during his work on the concrete floors he observed Way storm out of a meeting and exclaim "nobody calls me an asshole and gets away with it; you guys are gonna pay." George surmised that Way was referring to Stanley Miller.

{¶ 105} Hoffman testified that on certain unspecified occasions, his crews were prevented by Way from pouring concrete in large quantities at one time; that concrete was poured in a "piecemeal" fashion. According to Kramer, Way also prohibited Stanley Miller from pouring any concrete at all in certain areas even though Stanley Miller had already "set up" the area. In Kramer's opinion, Way's interference turned 40 days of concrete work into 60 days, significantly increasing Stanley Miller's labor costs. Kramer

also attributed extra costs to Ruhlin's decision to restrict contractor ingress and egress to a single set of doors. Although logic suggests that the poor schedule combined with the interference by Ruhlin to produce inefficiencies in the prosecution of the concrete work, there is a dearth of evidence as to the nature and extent of such inefficiencies. However, under Ohio law, the uncertainty which prevents a recovery of damages is generally uncertainty as to the fact of the damages, not the amount. *Beemes v. Public Emp. Retirement Sys.* (1995), 102 Ohio App.3d 782, 789, citing 22 American Jurisprudence 2d (1988, Supp. 1995) Damages, Section 601. Where it is certain that damages have resulted, mere uncertainty as to the amount will not preclude the right of recovery. Id. As to the amount of damages, only a reasonable certainty is required, which has been defined as that degree of certainty as the nature of the case permits. Id.

{¶ 106} Stanley Miller's one-page, $1.1 million claim seeks an equitable adjustment for "concrete costs" of $102,829.96. As stated above, "concrete costs" includes extra costs incurred in the concrete division, the general trades division, and the site work division. Plaintiff's Exhibit 64 does not, however, specify the extra costs that were incurred in each affected division and neither the evidence nor the briefs shed much light on the issue.

{¶ 107} If Kramer's testimony is to be believed, Stanley Miller's work on the concrete division was approximately 50 percent less efficient as a direct result of interference by Way. For a number of reasons, the court finds Kramer's estimate to be unreliable. First, the testimony regarding the inefficiencies in the concrete division is much less compelling than the testimony regarding inefficiencies in the masonry division. For example, there was testimony that OSFC placed reasonable limits on the size of concrete "pours" in an effort to maintain quality. There was also testimony and other evidence to support the conclusion that ingress and egress was restricted in order to protect finished flooring. The court finds that Ruhlin and OSFC acted reasonably with respect to these concerns.

{¶ 108} Second, the labor costs reflected in Stanley Miller's bid for the concrete division total $200,227. If Stanley Miller was 50 percent less efficient, those labor costs would have soared by $100,114. This would mean that Stanley Miller's $102,829.96 claim for "concrete costs" is composed almost entirely of the additional labor costs incurred in the concrete division. Such a conclusion does not square with the evidence

presented, nor does it support Stanley Miller's own contention that it incurred substantial extra concrete costs in the other two divisions.

{¶ 109} For the foregoing reasons, the court finds that Stanley Miller's claim for additional labor costs in the concrete division must fail due to a lack of necessary proof. In short, Stanley Miller has failed to establish that any of its extra costs in this division were directly attributable either to the faulty schedule or to the improper interference of Ruhlin with Stanley Miller's means and methods.

### B. Site Work Division

{¶ 110} With respect to concrete costs associated with the site work division, Stanley Miller claims that incomplete plans provided by the architect delayed Stanley Miller's prosecution of the work. Steve Miller testified that the plans did not provide sufficient reference points to enable Stanley Miller to lay out the concrete sidewalks. Miller estimated that his crews were delayed by approximately one month while they waited for additional information from the architect and that, when work resumed, Stanley Miller was required to put more men on the job in order to complete the work in the allotted time.

{¶ 111} Stanley Miller, however, has failed to convince the court that it was unfairly prohibited from filing an acceleration claim under the contractual claims process or that filing such a claim would have been a vain act. Indeed, both the length and the cause of the delay were known to Stanley Miller prior to the time it resumed the affected work, and the extra labor costs could have been tracked by Stanley Miller with little difficulty. In other words, even if the court were to conclude that OSFC breached the contract by failing to provide Stanley Miller with complete and accurate project plans and by thereafter failing to timely reply to Stanley Miller's requests for information, Stanley Miller waived its claim for damages by failing to comply with the contractual claims process.

{¶ 112} Moreover, unlike the inefficiencies experienced by Stanley Miller with regard to the masonry and concrete divisions of the work, the extra labor costs incurred by Stanley Miller for concrete in the site work division were not caused by scheduling errors or Ruhlin interference. Rather, the stated cause was errors and/or omissions in the project plans. As noted above, Stanley Miller could and should have tracked the

actual labor costs associated with the delay. Thus, recovery under a total cost theory is unavailable to Stanley Miller for this element of the one-page, $1.1 million claim. See *Cleveland Constr.,* supra.

### C. General Trades Division

{¶ 113} The testimony regarding the concrete costs allegedly incurred by Stanley Miller in the general trades division is scant. As noted above, Stanley Miller was required by the contract to furnish "all labor, equipment, material and supervision as required to complete: rough and finish carpentry, insulation, EIFS, shingled and metal roof, all interior and exterior doors, frames, and hardware, rolling security gates, glass and glazing, studs and drywall, all flooring, finish carpentry, caulking, gypsum board walls, acoustical ceilings, paint, division 10 specialties, stage equipment, projection screens, athletic equipment, and gym bleachers." (Article 9A.)

{¶ 114} It is not evident to the court from the above quoted description of the work that any meaningful portion of the general trades division involved concrete, and the testimony did not enlighten the court on this point. Accordingly, Stanley Miller has not satisfied its burden of proof on this issue.

{¶ 115} In sum, Stanley Miller has not proven that it is deserving of an equitable adjustment to the contract in order to compensate it for the additional concrete costs allegedly incurred as a result of OSFC's breach of contract.

## V. SITE WORK

{¶ 116} With respect to the division pertaining to site work, Stanley Miller agreed to provide "all labor, equipment, material and supervision as required to complete: site development, removal of existing concrete and asphalt, earthwork, asphalt paving, concrete walks and curbs, sewer collection systems, bicycle parking racks, landscape work, and site concrete." (Article 2B.)

{¶ 117} Stanley Miller claims that when it arrived at the job site to begin the construction of a retaining wall, the conditions were materially different than those that were represented to bidders. Specifically, Stanley Miller asserts that a substantial amount of fill was either missing from the site or unuseable, and that it was required to purchase additional fill and provide additional labor and equipment in order to restore

the site to the proper grade. According to Stanley Miller, additional costs of $34,307.84 were incurred in this process.

{¶ 118} Way testified that sufficient fill material was, in fact, on site but that Stanley Miller was not permitted to use the fill due to its own negligence in allowing the material to become saturated with water. OSFC also claims that Stanley Miller has waived this claim inasmuch as it agreed to assume such costs as evidenced by a correspondence dated March 21, 2003. (Defendant's Exhibit P.) Defendant's Exhibit P is a letter drafted by Reot memorializing his understanding as to the resolution of certain site work issues. Although this correspondence provides some evidence of an agreement, it is not conclusive given the fact that: 1) the correspondence was neither generated nor signed by Stanley Miller; and, 2) the correspondence conflicts with credible testimony from Stanley Miller's employees that the issue of costs was not resolved upon completion of the work.

{¶ 119} The contract provided at Article 7.5.3: "The Architect and the Construction Manager will promptly investigate the conditions and if the Architect or the Construction Manager finds that such conditions do materially differ from those upon which the Contract Documents permit the Contractor to rely and differ materially from those ordinarily encountered and generally recognized as inherent in Work of the character provided for in the Contract, causing an increase or decrease in the cost of the Contract, an appropriate Change Order shall be processed."

{¶ 120} When Defendant's Exhibit P is considered in conjunction with the trial testimony, the court is convinced that the site conditions were materially different than those represented in the bid documents. Specifically, the fill material left on site was either insufficient to perform the work or was unuseable due to factors beyond the control of Stanley Miller. The court is not persuaded by the testimony that Stanley Miller was at fault for the lack of useable fill.

{¶ 121} Both Way and Reot recalled that a change order was issued for the work on the retaining wall in the amount $10,000 or $12,000; neither witness identified the specific change order. Way believed the change order compensated Stanley Miller for the costs incurred to thaw soil left on site. Based upon the totality of the evidence, the court finds that the parties elected to proceed with the work and resolve the issue

informally rather than to resort to the change order procedures.  Consequently, the issue of waiver is not dispositive of this portion of Stanley Miller's site work claim.

{¶ 122}  Furthermore, the court finds that Stanley Miller has proven that the cost to purchase the additional backfill and the additional labor associated with the fill was a cost to Stanley Miller that was not contemplated by the agreement.  It is simply not reasonable to believe that Stanley Miller agreed to absorb this extra cost without compensation.

{¶ 123}  The one-page, $1.1 million claim shows that Stanley Miller lost $34,307.84 for the line item "back fill retaining wall."  However, Stanley Miller's controller, Kathy Kneisel, testified that according to Stanley Miller's company records, the estimated cost to back-fill the retaining wall was $44,400 and the actual cost was $50,929, resulting in a loss of only $7,529.  The court finds this figure to be the more reliable estimate.  Adding allowable overhead and profit results in a total equitable adjustment of $8,658.35.

## VI.  SITE CLEAN-UP

{¶ 124}  The relevant Articles of the contract provide in part:

{¶ 125}  "2.10.2     If the Contractor fails to clean up during the progress of the Work, the provision of paragraph GC 5.3 may be invoked.

{¶ 126}  "2.10.3     If the Contractor fails to maintain the areas adjacent to the Project clean and free of waste materials and rubbish, upon written notification by the Architect or the Construction Manager, the School District Board shall direct the local jurisdiction having responsibility for the area to clean the area.

{¶ 127}  "2.10.3.1  The cost of cleaning the area adjacent to the Project shall be deducted from the responsible Contractor as the Architect or the Construction Manager recommend and the State determines to be appropriate.

{¶ 128}  "2.10.3.2  The decision of the State shall be final.

{¶ 129}  "5.3.1     If the Contractor provides Defective Work or fails or neglects to prosecute the Work with the necessary diligence so as to complete the Work within the time specified  in the Contract Documents or any portion of the Work by the applicable milestone date as set forth in the Construction Schedule, the Construction Manager shall notify the Contractor in writing of such failure or neglect."

{¶ 130}  Stanley Miller claims that it was constantly pressured by Ruhlin to clean the site even though, in many instances, the debris had been discarded by other contractors.  Although the contract contained a provision for Ruhlin to bring in another contractor for the specific purpose of cleaning excess debris from the site, Stanley Miller claims that it alone was required to do such work.

{¶ 131}  There was little or no specificity provided by Stanley Miller with regard to those instances when Stanley Miller was required to clean debris left by other contractors nor was the extent of such work described with any particularity.  Stanley Miller did not take any photographs to support the claim nor did it otherwise document the claim.  Kramer acknowledged that his crew completed "clean-up slips" whenever such work was done but that his crew made no effort to describe the debris removed or apportion the costs to the responsible party.  Given the paucity of evidence to support this claim, the court finds that Stanley Miller has failed to prove that OSFC breached the contract with respect to site cleanup.

## VII.  ROOF TRUSSES

{¶ 132}  As part of the general trades division, Stanley Miller installed metal roof trusses throughout the project.  Hoffman testified that prior to the installation of the trusses, he cautioned Way that the project plans called for trusses to be installed in such a way that they would block access to some of the duct work.  According to Hoffman, Way told Stanley Miller to install the trusses as specified in the plans, and the evidence establishes that Stanley Miller did so.  When the HVAC contractor subsequently informed Way that access to the duct work was blocked by the trusses, Way instructed the contractor to cut the trusses.  According to Ron Nichols, Way then demanded that Stanley Miller "fix it."

{¶ 133}  OSFC's first defense is that the trusses were delivered to the site in a defective condition in that they were not manufactured by Stanley Miller's supplier in accordance with the project specifications.  However, the weight of the evidence does not support this contention.

{¶ 134}  OSFC's only other defense to this claim is that Stanley Miller must recover its damages from the HVAC contractor.  According to Hoffman, when he broached the subject of repair costs with Way, Way told him to send a bill to the HVAC

contractor. Steve Miller testified that the ordinary and usual practice in the construction industry under such circumstances is for the aggrieved contractor to assert its claim against the owner and for the owner to "back-charge" the responsible party. Reot acknowledged that OSFC uses this practice in resolving intra-contractor delay claims. In this instance, the responsible party is OSFC, by and through Ruhlin, inasmuch as Way instructed the HVAC contractor to cut the trusses.

{¶ 135} Based upon the foregoing, the court finds both that Stanley Miller is entitled to an equitable adjustment to the contract for the additional costs to repair the damaged trusses, and that resort to contractual claims process would have been a waste of time. Stanley Miller calculated these costs at $70,374, and the accuracy of such calculation was not challenged convincingly by OSFC. Adding ten percent profit and five percent overhead results in an equitable adjustment of $80,930.10.

## VIII. COLD WEATHER PROTECTION

{¶ 136} Stanley Miller's claim is based upon its assumption that, but for the scheduling issues attributable to Ruhlin, the Lehman project would have been under roof before the winter of 2003-2004. OSFC argues that Stanley Miller should not recover the costs of additional cold weather protection inasmuch as its bid estimate for cold weather protection exceeds the total actual costs incurred by Stanley Miller. Stanley Miller counters that even though it overestimated weather protection, it was still required to pay for extra cold weather protection in the winter of 2003-2004.

{¶ 137} Putting the merits of Stanley Miller's claim aside, the court finds that Stanley Miller waived its claim to additional cold weather costs inasmuch as it did not timely assert a claim for such costs pursuant to the contractual claims process. The one-page, $1.1 million claim was submitted in July 2004, many months after the extra costs were incurred. Stanley Miller has provided no justifiable reason for the lengthy delay.

{¶ 138} Moreover, even if there were waiver, Stanley Miller has not satisfied its burden of proof under either a total cost or modified total cost theory. Indeed, unlike the inefficiencies associated with the masonry and concrete, the actual costs of additional cold weather protection could have been calculated by Stanley Miller with relative ease. Additionally, Stanley Miller's apparent overbid presents a bar to recovery under either theory. See *Cleveland Constr.*, supra.

{¶ 139} In short, Stanley Miller has not proven that it is entitled to an equitable adjustment to the contract in order to compensate it for additional cold weather protection.

## IX. TEMPORARY ROADS

{¶ 140} The relevant language in division 2B of the contract states:

{¶ 141} "Bid Package #2B [Stanley Miller] shall provide and maintain the construction entrance off of Broad Ave. This contractor shall maintain the construction entrance and construction road that was installed by the #2A contractor. This contractor is shall (sic) remove these two (2) temporary site entrances when required by CM. Temporary roads for access around the site are the responsibility of each Prime Contractor requiring such. Bid Package #2B shall remove all site access roads (whether installed by 2A or not) prior to completing landscaping and final site improvements."

{¶ 142} Although the contract is not crystal clear, the court finds that Stanley Miller was required to construct and maintain the temporary road at Broad Road and that it was required to maintain a temporary road ending at 13th Street.

{¶ 143} The dispute regarding the temporary roads is two-fold. First, Stanley Miller claims that the site conditions in the area where it was to construct Broad Road differed significantly from those represented in the specifications. Second, Stanley Miller claims that the extensive repairs made to the temporary road ending at 13th Street far exceeded what could be reasonably considered "maintenance."

{¶ 144} Nichols testified that when he arrived at the site to begin construction of Broad Road he found that the grade was too high; the previous site contractor had not removed sufficient material for the area to receive limestone and asphalt. According to Nichols, Kramer was concerned about the tight time-frame and that Kramer simply told him to perform the necessary additional work and that he (Kramer) would work out the payment details later.

{¶ 145} The evidence does not show that Stanley Miller made an attempt to comply with the contractual claims process in regard to Broad Road. Although the evidence shows that the relationship between Stanley Miller and Ruhlin was strained, Stanley Miller has not demonstrated that it was either told not to file a claim or told that

the filing of a claim would be futile. The construction of Broad Road was completed in 2003. As stated above, the one-page, $1.1 million claim was not submitted to OSFC until July 2004. Stanley Miller has not provided the court with a justifiable reason for such a delay. At a minimum, the filing of an unsuccessful claim would have resulted in a contemporaneous estimation of costs. With respect to the repair of the sub-grade at 13th Street, Davis testified that the temporary road was damaged either by excessive water runoff or by the activities of another contractor. Davis stated that he informed Way that repair of the sub-grade was not Stanley Miller's obligation. Steve Miller testified that when he raised the issue with Way in May 2004, Way threatened to assess liquidated damages against Stanley Miller unless and until the damage was repaired. Miller subsequently brought in equipment to make the necessary repairs, "under protest."

{¶ 146} Even if the court were to determine that Stanley Miller did not waive the 13th Street portion of the temporary roads claim, the evidence does not support recovery based upon the total cost theory. First, as noted above, the extra costs associated with the temporary road ending at Broad Road were not compensable. Those costs are included in the temporary road claim and no apportionment is made. Second, the testimony is that the contract specifications called for the temporary road ending at 13th Street to be built on a steep slope. Thus, the possibility of extraordinary maintenance costs should have been contemplated by Stanley Miller at the time it bid the Lehman project. Third, the evidence supports a finding that Stanley Miller could have determined its actual equipment and labor costs with relative ease and to a reasonable degree of certainty. Fourth and finally, the damage to the road was not caused by OSFC.

{¶ 147} In short, Stanley Miller has not proven an entitlement to an equitable adjustment to the contract for the extra costs allegedly incurred in regard to the temporary roads.

## X. SEWER WORK

{¶ 148} The evidence establishes that the contractor responsible for the building foundation was required to leave voids in the concrete so that Stanley Miller could later run down spouts for the sanitary sewer. Stanley Miller contends that Way intentionally permitted the contractor to omit the openings; Way testified that he simply "missed it."

In either event, the foundation contractor left extra materials (90 degree  elbows) so that Stanley Miller could run the down-spouts outside the foundation.  Although Stanley Miller was able to complete the work, Kramer testified that the process required additional labor as well as the purchase of additional down-spouts.

{¶ 149}  According to Kramer, Way did not dispute Stanley Miller's entitlement to an equitable adjustment and he agreed to take care of payment at a later date. Hoffman testified that Way later reneged on his promise and told him not to bother to make such a claim because it would be denied.  Way admitted that he agreed to arrange for payment but he insists that Stanley Miller never got back to him with a figure.

{¶ 150}  In light of this testimony, the court finds that any effort by Stanley Miller to employ the contractual claims process would have been futile.  See, e.g., *Galayda*, supra; *Conti Corp.*, supra; *George Wiedemann Brewing Co.*, supra.  Thus, Stanley Miller did not waive its claim for an equitable adjustment to the contract regarding the additional sewer work.  The court finds that Stanley Miller established an entitlement to compensation for the extra sewer work.

{¶ 151}  According to Steve Miller, the $17,473.04 figure set forth in the one-page, $1.1 million dollar claim for "sewer work" represents the costs of 30 additional down-spouts. However, upon cross-examination Miller conceded that he was mistaken and that there were only seven extra down-spouts installed.  Thus, the court finds that Stanley Miller's claim must be reduced to $4,077.04.  Adding the requisite profit and overhead results in an equitable adjustment of $4,688.60.

## XI  INTEREST

{¶ 152}  As stated above, Stanley Miller has asserted a claim for interest earned but not paid on sums that, by agreement of the parties, became due and owing to Stanley Miller in or about 2004.  OSFC did not remit the funds until after this lawsuit was filed in 2006.  OSFC has not asserted a legal defense to the interest claim nor has it challenged the amount of such claim.  Accordingly, Stanley Miller shall be awarded damages representing the interest earned in the total amount of $36,074.04.

## XII.  OTHER CLAIMS

{¶ 153}   With respect to Stanley Miller's claim for unjust enrichment, absent proof of bad faith or fraud, an equitable action for unjust enrichment will not lie when the subject of the claim is governed by an express contract.   See *Kucan v. Gen. Am. Life Ins. Co.*, Franklin App. No. 01AP-1099, 2002-Ohio-4290, ¶35, citing *Rumpke v. Acme Sheet & Roofing, Inc.* (Nov. 12, 1999), 2d Dist. No. 17654.   Additionally, Stanley Miller may not pursue a claim for relief sounding in negligence where the loss is purely economic in nature.   See *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 45; *Inglis v. Am. Motors Corp.* (1965), 3 Ohio St.2d 132, paragraph one of the syllabus.   Accordingly, these claims are without merit.

## XIII.  THIRD-PARTY COMPLAINT

{¶ 154}   In its third-party complaint against OSFC, Canton asserts that it is a joint owner of the Lehman Middle School and that in the event that the court finds in favor of plaintiff, Canton is entitled to indemnification from co-owner OSFC in proportion to OSFC's ownership of the project.   OSFC has denied the allegations of the third-party complaint.

{¶ 155}   R.C. 3318.08 provides that:  "the commission [OSFC] shall enter into an agreement with the school district board for the construction and sale of the project. In either case, the agreement shall include, but need not be limited to, the following:

{¶ 156}   "* * *

{¶ 157}   "(F)  Ownership of or interest in the project during the period of construction, which shall be divided between the commission and the school district board in proportion to their respective contributions to the school district's project construction fund;

{¶ 158}   "* * *

{¶ 159}   "(O)  Provision for the deposit of an executed copy of the agreement in the office of the commission;

{¶ 160}   "* * *

{¶ 161}   "(T)   A provision stipulating that, unless otherwise authorized by the commission, any contingency reserve portion of the construction budget prescribed by the commission shall be used only to pay costs resulting from unforeseen job conditions, to comply with rulings regarding building and other codes, to pay costs related to design clarifications or corrections to contract documents, and *to pay the*

*costs of settlements or judgments related to the project* as provided under section 3318.086 [3318.08.6] of the Revised Code." (Emphasis added.)

{¶ 162} R.C. 3318.083 also states:

{¶ 163} "If, after the Ohio school facilities commission and a school district enter into a written agreement under section 3318.08 of the Revised Code for the construction of a classroom facilities project, the commission approves an increase in the basic project cost above the amount budgeted plus any interest earned and available in the project construction fund, the state and the school district shall share the increased cost in proportion to their respective contributions to the district's project construction fund."

{¶ 164} Canton's agreement with OSFC was not introduced into evidence in this case, nor was a copy of said agreement provided to the court as an attachment to either the third-party complaint or the answer thereto. However, inasmuch as an agreement that speaks to the payment of judgments related to the project is required by statute, judgment shall be rendered in favor of Canton as to the third-party complaint. Furthermore, the evidence establishes that ownership at the project during construction was shared jointly by Canton and OSFC, 23 percent to 77 percent respectively. Judgment shall be awarded accordingly.

**CONCLUSION**

{¶ 165} Based on the foregoing, the court finds that OSFC breached the contract with Stanley Miller and that the breach proximately caused Stanley Miller damages in the form of unanticipated extra costs. Thus, the court finds that Stanley Miller is entitled to an equitable adjustment to the contract as follows: $273,925.85 for masonry; $8,658.35 for site work; $80,930.10 for roof trusses; $4,018.79 for sewer work; and $36,074.04 for interest earned. Accordingly, judgment shall be rendered jointly against Canton and OSFC and in favor of plaintiff in the total amount of $404,276.93. Judgment shall be rendered in favor of Canton on the third-party complaint.

Court of Claims of Ohio

The Ohio Judicial Center

STANLEY MILLER CONSTRUCTION CO.

      Plaintiff

      v.

STATE OF OHIO

      Defendant

      and

CANTON CITY SCHOOL DISTRICT BOARD OF EDUCATION, et al.

      Defendants/Third-Party
      Plaintiffs

      v.

OHIO SCHOOL FACILITIES COMMISSION

      Defendant/Third-Party Defendant
      Case No. 2006-05632-PR

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issues of liability and damages. The court has considered the evidence and for the reasons set forth in the decision filed concurrently herewith, judgment is rendered jointly against Canton and OSFC and in favor of plaintiff in the total amount of $404,276.93. Judgment is rendered in favor of Canton on the third-party complaint. Court costs are assessed equally against defendants/third-party plaintiffs
and third-party defendant. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

John C. Ross
4518 Fulton Drive, N.W.
P.O. Box 35548
Canton, Ohio 44735-5548

Jon C. Walden
Paula Luna Paoletti
Scott Branam
William C. Becker
James E. Rook
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Matthew Yackshaw
Robert J. McBride Sr.
Millennium Centre, Suite 300
200 Market Ave., N.
P.O. Box 24213
Canton, Ohio 44701-4213

LP/cmd
Filed March 1, 2010
To S.C. reporter March 30, 2010