[Cite as *Cent. Allied Ents., Inc. v. Adjutant General's Dept.*, 2010-Ohio-3229.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

CENTRAL ALLIED ENTERPRISES, INC.

    Plaintiff/Counter Defendant

    v.

THE ADJUTANT GENERAL'S DEPARTMENT

    Defendant/Counter Plaintiff
    Case No. 2007-07841

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiff/counter defendant, Central-Allied Enterprises, Inc. (CAE), brought this action alleging breach of contract, unjust enrichment, and constructive change order. Defendant/counter plaintiff, the Adjutant General's Department (AGD), filed a counterclaim for breach of contract. The issues of liability and damages were bifurcated initially; however, prior to the commencement of trial and with the consent of the court, the parties agreed to proceed to trial on both issues.

{¶ 2} The case concerns a project to rebuild the helicopter apron at the Akron Canton Army Aviation Support Facility. Initially, AGD hired Superior Asphalt Paving Company to mill the existing asphalt; however, the milling operation was halted when the surface began shifting due to excessive moisture in the soil. (Defendant's Exhibit B.) AGD then hired Whitworth Borta (WB), an engineering company that specialized in the design of airports, to redesign the project and prepare the plans and specifications.

{¶ 3} WB hired Hall's Testing and Consulting (Hall) to assess the soil composition and to determine whether the soil had the appropriate strength-bearing

characteristics necessary for airport construction. Hall prepared a report which concluded that the soil was suitable for construction "when brought to proper moisture conditions." (Plaintiff's Exhibit 4.) The Hall report was available for review pre-bid and was included as an addendum to the contract documents.

{¶ 4} CAE's field engineer, Joe Seck, testified that he read the Hall report and that he walked over the construction site prior to the submission of CAE's bid. CAE was the low bidder and in July 2003, entered into a lump-sum contract with AGD. According to Seck, CAE was to reconstruct the access road, to excavate and replace the apron as designed, and to excavate the area located adjacent to the apron designated for a detention pond.[1] WB's design included lengthening the taxiway and reconstructing the apron. It is undisputed that the apron area spanned approximately 11 acres. WB's plans called for removal of the existing asphalt and excavation of the soil to a depth of 20 inches, to be replaced with 12 inches of aggregate topped with eight inches of new asphalt in order to accommodate the heavier Chinook helicopters. Augustine Ubaldi, WB's principle and professional engineer, testified that WB was not the construction manager but remained on site for quality assurance and to serve as the associate for AGD. WB also provided the layout at the site and established the grades.

{¶ 5} CAE asserts that during the apron reconstruction, isolated areas of unsuitable soil were encountered in August and September 2004, such that CAE's subcontractor was required to excavate several more inches to reach stable soil and to replace the excavated soil with additional aggregate. In some of these areas, CAE layered "geo-fabric" with the aggregate in order to bring the soil to suitable strength. CAE seeks reimbursement for the costs of this extra work not contemplated by the contract as bid.

{¶ 6} CAE asserts that during those times when the unsuitable soil was discovered, representatives from WB and CAE were present but they were unable to reach an agreement as to payment for the added excavation. CAE chose to proceed with the work so as not to delay the project and both parties agreed that any additional costs would be reconciled by a final change order to be prepared and submitted upon CAE's completion of the project. Seck testified that CAE's work on the project was

substantially complete in December 2004. According to Seck, the only remaining tasks included repair seeding, some asphalt paving, and a few electrical adjustments with the gate openers. Seck testified that he had requested final quantities from WB and that he was waiting for verification of quantities used for the excavation in order to prepare the final change order; however, WB did not provide such numbers to CAE. Seck testified that he completed his own calculations in reference to the undercuts and that he then asked WB to submit the proposed change order in January 2006, but that WB did not respond to that request either. (Plaintiff's Exhibit 8.)

{¶ 7} CAE eventually received an e-mail from Steve Potoczak, WB's vice president, sent January 25, 2006, which states as follow:

{¶ 8} "Joe and Ken:

{¶ 9} "Just thought I would give you a courtesy email and tell you that we have stopped working on all work related to the AASF No.1 project because our contract is and has been expired and we have not been paid for some time now. I know you know about how it works to get back into the 'system' and get paid. So, bear with me on this one. Hopefully things will get straightened out soon.

{¶ 10} "I've gotten your pay requests and was working on the closeout package (which includes a closeout change order for each of you) but have stopped for now. I would advise that you both check with the [AGD] and see if your contracts are expired too." (Plaintiff's Exhibit 9.) CAE subsequently instituted this action.

{¶ 11} AGD contends that CAE's claim is untimely, that CAE failed to submit a written change order both before incurring additional costs and prior to completion of CAE's work on the project, and that AGD did not execute a written waiver of the requirement for a written change order. Thus, AGD contends that CAE's failure to provide timely notice of the claim for extra work constitutes a waiver of such claim. In addition, AGD asserts that CAE cannot prevail on a claim for unjust enrichment or constructive change order when the work at issue is governed by the terms of an express contract. Finally, AGD has asserted a counterclaim, wherein AGD contends that although CAE may have excavated more soil and used more aggregate at the

---

[1]A detention pond is designed to collect and store storm water runoff which is then allowed to leach into the ground.

apron area, it excavated less soil and placed less aggregate material at the detention pond such that AGD is entitled to a rebate of approximately $11,000.

{¶ 12} CAE disputes the counterclaim under the theory that this was a fixed-sum contract and that CAE performed all that was required to complete the project along with the extra work. CAE makes the distinction that the detention pond ended up being smaller than originally designed and that the area required less excavation to achieve the desired grade; however, such alterations were not accomplished by a change order issued by AGD. Therefore, CAE asserts that AGD cannot prevail on the counterclaim. In addition, CAE contends that AGD's claim is untimely in that the proposed "deduct change order" was issued November 15, 2007, during the course of this litigation and well after the project was completed.

{¶ 13} Differing site conditions are addressed in the contract under Article 7. Thus, once CAE determined that there were subsurface concealed conditions that differed materially from those described in the contract documents, the contract provided instructions, specific to such event, that were necessary in order to request additional payment.

{¶ 14} In reference to extra or additional work not contemplated by the contract, the parties are directed as follows. Article 7.3.2 requires that the "Contractor shall notify the Architect/Engineer in writing of such conditions before they are disturbed." (Defendant's Exhibit G.) Article 7.3.3 states that if the "Architect/Engineer finds that such conditions do materially differ from those indicated or reasonably inferred from the Contract Documents, the Architect/Engineer shall process an appropriate Change Order."[2]

{¶ 15} Article 7 further states, in relevant part:

{¶ 16} "7.3.3.1 The Contractor will only proceed with a proper authorization, in writing, as provided by the Contract Documents.

{¶ 17} "7.3.2.2 No claim of the Contractor under paragraph GC 7.3.3 shall be allowed unless the Contractor provided the notice required in paragraph GC 7.3.2." (Defendant's Exhibit G.)

---

[2]Seck testified that approximately five change orders were processed during the course of the project and that the change orders were resolved within two weeks to two months.

{¶ 18} Ohio law allows contractors to recover additional costs when differing site conditions negatively affect their work. *Sherman R. Smoot Co. v. State* (2000), 136 Ohio App.3d 166. "Differing site conditions claims arise from two separate and distinct circumstances, usually referred to as Types I and II differing site conditions. *H. B. Mac, Inc. v. United States* (C.A.Fed., 1998), 153 F.3d 1338, 1343; Cushman, Jacobsen & Trimble, Proving and Pricing Construction Claims (2d 1996), Section 7.2. A Type I differing site condition occurs where actual site conditions differ from the conditions indicated in the contract. A Type II differing site condition occurs where actual site conditions differ from conditions normally encountered in work of the character provided for in the contract. *Youngdale & Sons Construction Co., Inc. v. United States* (1993), 27 Fed. Cl. 516, 528; *H. B. Mac, Inc.*, supra." Id. at 173.

{¶ 19} The Hall report states that the "general soil stratum consists of very soft to stiff completely weather decomposed siltstone, clay stone, and sandstone shale with poor drainage properties underlying 1" to 18" of glacial till. These soils were never excavated and compacted prior to previous hot mix asphalt placement and are virgin soils. Provisions were not made for site drainage. Evidence that there were some underlying problems originally is indicated in the variable thickness of asphalt. * * * All values are typical of glaciated deposits in the area; however throughout the site varying fractions of silt, clay and sand may require additional field verification during construction." (Defendant's Exhibit B.) In the instant case, the court finds that there was insufficient evidence adduced at trial to establish that the actual nature of the soil differed from the type of soil normally encountered during excavation in that region of Ohio.

{¶ 20} To prevail on a Type I claim, CAE must prove: "(1) that its contract contains an affirmative indication regarding the subsurface or latent physical condition that forms the basis of the claim; (2) that the contractor interpreted the contract as would a reasonably prudent contractor; (3) that the contractor reasonably relied upon the contract indications regarding the subsurface or latent physical condition; (4) that the contractor encountered conditions at the job site which differed materially from the contract indications regarding the subsurface or latent physical condition; (5) that the actual conditions encountered by the contractor were reasonably unforeseeable; and (6)

that the contractor incurred increased costs which are solely attributable to the materially different subsurface or latent physical condition. *Youngdale & Sons*, at 528; *Weeks Dredging & Contracting, Inc. v. United States* (1987), 13 Cl. Ct. 193, 218; Cushman, Jacobsen & Trimble, at Section 7.4." Id. at 174.

{¶ 21} Seck testified that CAE's work on the project was underway in June 2004, that Potoczak was WB's field representative, and that Potoczak directed CAE's work. After CAE completed the excavation of the apron, the area was "proof-rolled" meaning that a loaded truck was driven over the site and areas of unstable soil were staked and marked for further excavation. According to Seck, CAE's subcontractor excavated those select areas an additional 12 to 24 inches and that additional aggregate was brought in for the fill. Seck stated that in some areas his crew had to layer geo-fabric and aggregate to achieve suitable stability and grade.

{¶ 22} As owner, defendant was required to supply sufficient plans and specifications such that a contractor can perform under the contract. According to CAE, the occurrence of unsuitable soil was a concealed condition that was not known or disclosed in the contract documents or during the bid process. Conversely, defendant contends that the contract documents included the Hall report which references subsurface water running freely into the test hole that had been dug by a backhoe during Hall's investigation of the soil. In addition, photographs taken at the pre-bid meeting depict the presence of water pooling on the pavement surface. (Defendant's Exhibits E, F, and I.) Potoczak testified that he was the project manager for WB and that he worked with Ubaldi in preparing the project plans. Potoczak testified that undercuts were necessary in three major areas of the apron and that this was not a materially different condition than that which was represented in the Hall report inasmuch as water was known to collect in the subsurface and the plans included drainage measures to divert the subsurface water to catch-basins. Indeed, Seck testified that CAE installed catch-basins and drainage pipes after the initial excavation was completed by the subcontractor. According to Potoczak, the design included the use of "geo-fabric" and that this is a "red flag" to bidders that substandard soil may be encountered in some areas.

{¶ 23} Upon review of the evidence presented, the court is not convinced that the actual conditions encountered by CAE differed materially from the contract indications regarding the subsurface or that such conditions were not reasonably foreseeable. Based upon the information provided to bidders in the Hall report, the presence of standing water in various areas of the apron on the day of the pre-bid meeting, and the architect's inclusion of catch basins and a detention pond to facilitate drainage, the court finds that the presence of excessive moisture and drainage problems in the subsoil was disclosed to bidders. The inclusion of geo-fabric in the design also served as notice of the possibility that substandard soil existed in select areas. Thus, the court concludes that the conditions encountered by CAE were not materially different from those outlined in the contract and that they were reasonably foreseeable.[3]

{¶ 24} Even assuming the court were to find that CAE encountered concealed subsurface conditions which differed materially from those described in the contract documents, CAE failed to abide by the contract provisions regarding notice and written authorization to proceed. Seck testified that he and Potoczak discussed the cost of the extra work but that they could not reach an agreement in the field. Rather than delay the process, they agreed that a final reconciliation would be done upon CAE's completion of the work. Potoczak testified that Seck agreed to proceed with the work rather than to seek approval of a change order, that a final change order would be submitted at the end of the project, and that he did not consider this to be an unusual procedure. Nonetheless, Potoczak testified that a number of change orders had been executed by the parties throughout the project, that WB's role in the process was to make a recommendation to the owner as to a proposed change order, but that WB was not to prepare change orders. In addition, Potoczak testified that according to the provisions in Article 8 of the contract, CAE's claim for additional work should have been submitted in writing to WB prior to the expiration of the contract. Finally, Potaczak stated that CAE itself could have initiated a change order through AGD.

{¶ 25} "It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had

---

[3]The court accorded little weight to the opinions offered by CAE's engineering expert, Ronald

for such work without a written directive therefor in compliance with the terms of the contract, unless waived by the owner or employer." *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St.3d 353, 360, 1997-Ohio-202. According to defendant, CAE failed both to provide timely written notice and to follow the terms and procedures as outlined in the contract. According to the contract, such failure constitutes a waiver of any claim for increased costs to perform.

{¶ 26} Article 7.1.1 states that the "Department, without invalidating the Contract, may order changes in the Work consisting of additions, deletions or other revisions, including without limitation revisions resulting from an extension granted in accordance with Paragraph GC 6.4. To the extent the time for Contract Completion or the Contract Price is affected, the Contract will be equitably adjusted by Change Order in accordance with this Article and the Change Order Procedure and Pricing Guidelines (CO)." In addition, the contract provides, as follows:

{¶ 27} " * * *

{¶ 28} "7.1.1.3   The Contractor shall not proceed with any change in the Work without the required written Authorization.

{¶ 29} "7.1.1.4   The Contractor understands and agrees that agreement to a Change order is final and without reservation of any rights.

{¶ 30} "7.1.1.5   The Department reserves the right to cancel or modify any Change Order authorization." (Defendant's Exhibit G.)

{¶ 31} Any change in the cost of the work was governed by the provisions of Article 7.2, which states as follows.

{¶ 32} "7.2   PRICE DETERMINATION

{¶ 33} "7.2.1 The maximum cost or credit resulting from a change in the Work shall be determined in accordance with the Change Order Procedure and Pricing Guidelines and as described below.

{¶ 34} "* * *

{¶ 35} "7.2.3 *In the event that no agreement can be reached between the Contractor and the Department as to the cost or credit resulting from a change in the work, said cost or credit shall be determined by the Department, upon the*

Erb.

*recommendation of the Architect/Engineer.*"    (Defendant's Exhibit G.)    (Emphasis added.)

**{¶ 36}** The contract provides in Article 8 as follows.

**{¶ 37}** "8.1.1 Whenever the Contractor intends to seek additional compensation * * * whether due to delay, extra Work, additional Work, breach of Contract, or other causes arising out of or related to the Contract or the Project, the Contractor shall follow the procedures set forth in this Article.  To the fullest extent permitted by law, failure of the Contractor to timely provide such notice shall constitute a waiver by the Contractor of any claim for additional compensation * * *.

**{¶ 38}** "8.1.2 The Contractor shall make a claim in writing filed with the Architect/Engineer and prior to Contract Completion, provided the Contractor notified the Architect/Engineer, in writing, no more than ten(10) days after the initial occurrence of the facts, which are the basis of the claim.

**{¶ 39}** "8.1.3 In every such written claim submitted in accordance with this Article, the Contractor shall submit three (3) copies of its claim, within thirty (30) days of the notice required by Subparagraph GC 8.1.2, detailing the amounts claimed and providing the following information to permit timely and appropriate evaluation of the claim, determination of responsibility and any remaining opportunity for mitigation.  If the Contractor is unable to calculate any amount claimed in detail, the Contractor shall use its best efforts to provide a reasonable estimate of such amount.

**{¶ 40}** "8.2.1  The Contractor shall submit three (3) copies of the claim; one (1) to the Architect/Engineer and two (2) to the Department.  Upon submission of the claim by the Contractor, the Architect/Engineer and the Department will meet to review and discuss the claim." (Defendant's Exhibit G.)

**{¶ 41}** The court finds that the terms of the contract are clear and unambiguous.  As such, the court notes that if no ambiguity exists, the terms of the contract must simply be applied without resorting to methods of contract construction and interpretation.  See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241; *Freiling v. Ohio Lottery Comm'n*, Ct. of Cl. No. 2003-11275, 2004-Ohio-6583, ¶14.

**{¶ 42}** In the instant case, CAE seeks to be excused from compliance with the notice and change order provisions of the contract.  Seck testified that the undercuts

were performed in August and September 2004, and that CAE's work was 95 percent complete by December 2004. At trial, CAE produced a written change order dated January 11, 2006, and AGD submitted a one-page document that Seck identified as the change order that was prepared for CAE's counsel, dated September 20, 2006. (Plaintiff's Exhibit 8, Defendant's Exhibit A.) Ubaldi testified that he was aware that Potoczak had directed CAE to perform additional excavation work in the field and that a final change order would be submitted to WB. Ubaldi stated that WB would then reconcile the costs by comparing the specifications for the work and the quantities of material called for in the contract against the calculations of the work performed and the materials used.

{¶ 43} Seck testified that CAE asked WB to calculate the final sums for the change order and to submit the change order to AGD. Nonetheless, WB never provided CAE with the final numbers before both CAE's and WB's contracts expired. The January 2006 e-mail from Potoczak states that WB had received CAE's pay requests and that it had been working on a closeout package before its own contract expired. Ubaldi testified that WB's contract expired sometime in the fall of 2005.

{¶ 44} The testimony and evidence presented at trial was insufficient to establish a usable timeline for the court to determine with any specificity when CAE's contract expired, the date that WB's contract expired, the date that a written change order was submitted to WB, and the corresponding date that a change order was presented to AGD. The court further finds that Seck's testimony was inconsistent and at times contradictory. At one point in the trial, Seck testified that in 2005 he had been waiting to receive figures from WB in reference to work performed by his electrical subcontractors before he could prepare and submit a final change order. Seck later testified that he could not submit a final change order prior to 2006 because he had been waiting for verification from WB as to the dimensions excavated in excess of the contract specifications and the corresponding amounts of aggregate used to fill these areas. This purported reliance on WB is belied by the fact that Seck testified that he had kept his own records of such measurements and that he was able to obtain from CAE a computer printout of the daily deliveries of aggregate to the site for use in compiling the change order he prepared in 2006. (Plaintiff's Exhibits 7, 10.)

{¶ 45} In addition, Seck failed to establish that the pay requests referenced by WB concerned the excavation as opposed to adjustments in regard to CAE's electrical subcontractors. The record lacks any written documentation authored by CAE that provided notice to WB or to AGD that the matter remained unresolved and there is a paucity of evidence to verify what, if anything, CAE did to preserve its rights in accordance with the terms of the contract. Even CAE's argument that it had no ability to submit a change order on its own does not square with the contract language in Article 8, specifically, Article 8.2.1.

{¶ 46} Upon review of the evidence adduced at trial, the court finds that CAE failed to submit a written change order to WB or to AGD prior to CAE's completion of the project. Indeed, the court is not convinced that CAE was actively seeking to assert their claim throughout 2005. Regardless of the purported reliance on WB suggested by Seck, CAE waited an entire calendar year after substantial completion of the project to compile the change order and reduce it to written form.

{¶ 47} To the extent that CAE argues that AGD through its agent, WB, waived the notice provisions of the contract, AGD contends that any waiver of the contract provisions was required to be expressed in writing in the form of a change order pursuant to Article 7.

{¶ 48} "'Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional.' *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, ¶49, 861 N.E.2d 109. A party asserting waiver must prove it by establishing a clear, unequivocal, decisive act by the other party, demonstrating the intent to waive." *Maghie & Savage, Inc. v. P.J. Dick Inc.*, Franklin App. No. 08Ap-487, 2009-Ohio-2164, ¶27. (Additional citations omitted.)

{¶ 49} CAE contends that WB agreed to CAE's decision to proceed with the work and to submit a final change order, and that such act constituted a waiver of the change order and notice provisions of the contract. CAE asserts that it was unable to assert a claim because WB did not respond with the figures CAE requested in order to compile the change order prior to CAE's completion of the project and prior to WB's contract expiration. Upon review, the court finds insufficient evidence in the record of a clear

and unequivocal act demonstrating AGD's intent to waive the contractual notice, change order, and claim review requirements.

{¶ 50} AGD further contends that CAE's claim for a constructive change order is moot, in light of the opinion of the Supreme Court of Ohio in *Dugan & Meyers Const. Co., Inc. v. Ohio Dept. of Admin. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, wherein the Supreme Court held that "when a contract has an express provision governing a dispute, that provision will be applied; the court will not rewrite the contract to achieve a more equitable result." Id. at ¶39.

{¶ 51} This court has recently addressed a similar argument and the court found that "*Dugan & Meyers* does not hold that there are no circumstances under which there may be a waiver of strict compliance with Article 8. Rather, the court in *Dugan & Meyers* simply found that the contractor in that case had failed to demonstrate that it was excused from strict compliance with the contractual claims process." *Stanley Miller Constr. Co. v. Ohio Sch. Facilities Comm'n*, Ct. of Cl. No. 2006-04351, 2010-Ohio-1528, ¶80. Nonetheless, in *Stanley Miller*, the court determined that the contractor "gave [the owner] both oral and written notice that a claim was contemplated, and that [the owner] was not unfairly prejudiced by the failure of [the contractor] to strictly comply with the contractual dispute resolution process." The court finds that the *Stanley Miller* case is factually distinguishable in that the contractor in *Stanley Miller* was communicating with the owner's representative orally and in writing and when that avenue was unavailing, the contractor repeatedly notified the owner that there were problems that would result in additional costs.

{¶ 52} Similarly, in *Craft General Contractors, Inc. v. City of Urbana* (Feb. 2, 1982), Franklin App. No. 81AP-346, the Tenth District Court of Appeals held that the contractor's "delay in filing [a] written claim beyond the one-week time period stipulated in * * * the contract did not defeat its claim since [the owners] had independent knowledge of the condition complained of and had oral notice of [the contractor's] complaint and [the owners] were not prejudiced by lack of earlier written notice." Id. at 23. In another recent case, this court found that the contract allowed for an equitable adjustment via change order to compensate the contractor for additional work. The court determined that the parties had executed a change order but that the contractor

had placed a handwritten notation on the change order specifying that the sum approved did not fully compensate the contractor for the additional work performed and that the contractor reserved the right to pursue additional compensation. Notably, in that case the contractor submitted its written change order within 30 days of the occurrence of the condition; the parties engaged in negotiations as to the cost and scope of the work which were documented in writing; and the Article 8 process was instituted in a timely manner. See *R.E. Schweitzer Construction Co. v. University of Cincinnati* (May 18, 2010)*,* Ct. of Cl. No. 2007-02114.

{¶ 53} In this case, CAE communicated orally with the owner's representative in the fall of 2004 and at some point in 2005, but none of these interactions were documented. CAE failed to submit a formal written change order to WB or to AGD within the parameters outlined in the contract or even within a reasonable period of time. CAE attributes the delay in submitting the change order to the fact that it was waiting for WB to verify the quantities that were the subject of the proposed change order, and that because WB's contract with AGD expired prior to the change order being submitted, CAE had no way to seek payment from AGD. The court finds that the contract language does not support CAE's argument. The court is constrained to permit such a prolonged delay without placing some responsibility on the contractor to preserve its claim in accordance with the contract provisions. Accordingly, the court finds that CAE has failed to demonstrate that the parties executed a constructive change order or that AGD waived compliance with the contractual claims process.

{¶ 54} With respect to CAE's claim for unjust enrichment, absent proof of bad faith or fraud, an equitable action for unjust enrichment will not lie when the subject of the claim is governed by an express contract. See *Kucan v. Gen. Am. Life Ins. Co.*, Franklin App. No. 01AP-1099, 2002-Ohio-4290, ¶35, citing *Rumpke v. Acme Sheet & Roofing, Inc.* (Nov. 12, 1999), Montgomery App. No. 17654. In *Struna v. Ohio Lottery Commission,* Franklin App. No. 03AP-787, 2004-Ohio-5576, ¶22, the Tenth District Court of Appeals stated that "[u]njust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another. *Turner v. Langenbrunner*, Warren App. No. CA2003-10-

099, 2004-Ohio-2814, at ¶38, citing *University Hospitals of Cleveland, Inc. v. Lynch*, 96 Ohio St. 3d 118, 2002-Ohio-3748, at ¶60." In the instant case, the subject matter of plaintiff/counter defendant's unjust enrichment claim was governed by the terms of the contract between CAE and AGD. Consequently, the doctrine of unjust enrichment has no application to this case. Accordingly, such claim is without merit.

{¶ 55} Turning to the counterclaim asserted by AGD, the court makes the following determination.

{¶ 56} Article 7 - Changes in the work, provides:

{¶ 57} "7.1     Change Order

{¶ 58} "7.1.1 The Department, without invalidating the Contract, may *order* changes in the Work consisting of additions, deletions or other revisions, * * *.

{¶ 59} "7.1.1.3 The Contractor shall not proceed with any change in the Work without the required written Authorization." (Defendant's Exhibit C.)

{¶ 60} AGD presented CAE with a deduct change order in November 2007, nearly three years after CAE's work on the project was substantially complete, seeking a rebate of approximately $11,000. AGD asserts that CAE committed a breach of the contract in that CAE excavated less soil and correspondingly used less aggregate at the site of the detention pond than was called for in the contract. CAE contends that AGD cannot prevail on its claim because AGD did not order a change in the work as required under Article 7 of the contract. In addition, CAE asserts that the deduct change order was untimely, inasmuch as the work on the project was substantially completed more than two years earlier. Potoczak testified that, as the project unfolded, a significant portion of the detention pond was not needed. Potoczak also explained that CAE excavated less soil because the grade at the detention pond site was found to be lower than the design anticipated. Thus, as built, CAE used less aggregate and performed less excavation. Both Potoczak and Ubaldi acknowledged that CAE completed what was required but that the work at the detention pond site that is the subject of AGD's deduct change order was not accomplished in response to a change in the work that was ordered by AGD. Upon review of the evidence adduced at trial, the court finds that AGD did not order a change in the work and thus AGD's counterclaim fails.

{¶ 61} For the foregoing reasons, the court finds that AGD is not liable to CAE for breach of contract, unjust enrichment, or as the result of a constructive change order. Accordingly, judgment shall be rendered in favor of AGD, on the issue of liability and in favor of CAE as to AGD's counterclaim.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

CENTRAL ALLIED ENTERPRISES, INC.

    Plaintiff/Counter Defendant

    v.

THE ADJUTANT GENERAL'S DEPARTMENT

    Defendant/Counter Plaintiff
    Case No. 2007-07841

Judge Joseph T. Clark

JUDGMENT ENTRY

This case was tried to the court on the issues of liability and damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant/counter plaintiff on the issue of liability and in favor of plaintiff/counter defendant on the counterclaim. Court

costs are assessed against plaintiff/counter defendant. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Nada G. Faddoul                                 Scott Branam
Terrence L. Seeberger                       William C. Becker
Thomas C. O'Connell                        Assistant Attorneys General
3475 Ridgewood Road                      150 East Gay Street, 18th Floor
Akron, Ohio 44333-3163                   Columbus, Ohio 43215-3130

SJM/cmd/Filed June 18, 2010/To S.C. reporter July 7, 2010